UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MAMADOU BARRY,

                                        Plaintiff,

          v.

ANTHONY C. RUSSO, *et al.*,

                                        Defendants.

---

No. 22-CV-3835 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Mamadou Barry
Attica, NY
*Pro Se Plaintiff*

Kathleen Kelly, Esq.
New York State Attorney General's Office
White Plains, NY
*Counsel for Defendants Anthony C. Russo, Sookdew Ramdeen, and Mark Royce*

Kathleen Kelly, Esq.
Kathryn E Martin, Esq.
New York State Attorney General's Office
White Plains, NY
*Counsel for Sergeant Polanco*

KENNETH M. KARAS, United States District Judge:

          Plaintiff Mamadou Barry ("Plaintiff"), who is currently incarcerated at Green Haven

Correctional Facility ("Green Haven"), proceeding pro se, brings this Action, pursuant to 42

U.S.C. § 1983, against Green Haven Superintendent Mary Royce ("Royce"), Acting

Superintendent Anthony C. Russo ("Russo"), Sergeant Polanco ("Polanco"), and Correction

Officer Sookdew Ramdeen ("Ramdeen," and collectively, "Defendants").  (*See generally* Compl.

(Dkt. No. 2).)  Plaintiff alleges that Defendants violated his constitutional rights, in that they

failed to protect him from assault and were deliberately indifferent to his serious medical needs resulting from the assault; subjected him to unconstitutional conditions of confinement; and failed to provide him religious meals.  (*See generally id.*)  Before the Court is (1) Defendant Polanco's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Polanco Motion"), (*see* Polanco Not. of Mot. ("P Not. of Mot.") (Dkt. No. 39)); (2) Defendants Royce and Russo's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) ("RR Motion"), (*see* Royce and Russo's Not. of Mot. ("RR Not. of Mot.") (Dkt. No. 59)); and (3) Plaintiff's request for an order directing the New York State Office of the Attorney General ("NYSOAG") to provide the U.S. Marshals Service ("USMS") with information necessary to serve Ramdeen, (*see* Dkt. Nos. 35–37).[1]  For the following reasons, Polanco's Motion is granted in part and denied in part, Royce and Russo's Motion is granted in part and denied in part, and Plaintiff's request is granted.

## I.  Background

### A.  Factual Background

The following facts are drawn from Plaintiff's Complaint and associated filings, all of which are assumed to be true for the purpose of resolving the instant Motion.  *See Div. 1181*

---

[1] Plaintiff's initial request was for an order directing NYSOAG to provide the USMS with information necessary to serve Russo, Royce, and Ramdeen.  (*See* Dkt. No. 35.)  However, as of the date that this Opinion was filed, Defendants Royce and Russo were served.  (*See* Dkt. No. 52 (letter from NYSOAG to the Court, dated September 14, 2023, stating that "Defendants Mr. Mark Royce and Mr. Anthony Russo were recently served").)  The record reflects that Defendant Ramdeen remains unserved.  (*See generally* Dkt.)  Accordingly, the Court finds that Plaintiff's request is ripe only as to Ramdeen and is otherwise moot as to Royce and Russo. *Blackhawk v. Hughes*, No. 20-CV-241, 2021 WL 752838, at *2 (N.D.N.Y. Feb. 26, 2021) (adopted report and recommendation denying plaintiff's service request as moot, where service was already effectuated upon defendant); *see also Benitez v. King*, No. 17-CV-6230, 2020 WL 4933674, at *4 (W.D.N.Y. Aug. 24, 2020) ("[T]he Court finds moot [p]laintiff's request for service as to [defendant,] as [defendant] was already served . . . .").

*Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam).[2]

### 1.  December 16, 2020 Incident and Subsequent Events

In November 2020, Plaintiff began receiving "threat notes" on his bed every time he returned to his cell from a "call out" or recreation.  (Compl. at 13.)  As a result, Plaintiff wrote multiple letters to Royce and spoke to him on various occasions about these notes.  (*Id.*)  Plaintiff also wrote multiple letters to Russo, sending along with the letters some of the actual notes, and spoke with him a few times about the threats.  (*Id.*)  In addition to informing Royce and Russo about the notes and that he feared for his safety, Plaintiff claims that he told all the officers that worked on his cell block about the notes, including Ramdeen.  (*Id.* at 15–16.)  Moreover, Plaintiff asked both Royce and Russo to investigate the matter and requested to be moved out of his current cell block for safety reasons.  (*Id.* at 13.)  However, Plaintiff was not moved.  (*Id.*)

Plaintiff alleges that on December 16, 2020, he returned to his cell block and asked Ramdeen "not to open Plaintiff['s] cell . . . for the rest of the night[] because Plaintif[f] received every[t]hing Plaintiff signed up for."  (*Id.* at 4.)  Ramdeen, who controlled all of the cell doors,

---

[2] When reviewing a complaint submitted by a pro se plaintiff, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks and citation omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a defendant's] request for a pre-motion conference," *Jones v. Federal Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), "documents either in [the plaintiff's] possession or of which [the] plaintiff[] had knowledge and relied on in bringing suit," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quotation marks omitted), and "[plaintiff's] opposition memorandum," *Gadson v. Goord*, No. 96-CV-7544, 1997 WL 714878, at *1 n.2 (S.D.N.Y. Nov. 17, 1997).

Accordingly, here, the Court will consider the additional submissions by the Plaintiff to the extent they are consistent with the allegations in the Complaint.

responded to Plaintiff in sum and substance "[d]on't tell me how to do my job, go lock in, that[']s a direct order." (*Id.*)  Plaintiff proceeded to his cell, entered, and closed the cell gate. (*Id.*)  A minute later, an officer walked by and secured all the gates.  (*Id.*)

Plaintiff asserts that as soon as he began unpacking items out of his commissary bag, his cell opened.  (*Id.*)  Plaintiff turned around to see why his cell opened but was met with punches to his face and a sharp object to the left side of his face.  (*Id.* at 4–5.)  Plaintiff states that he lost consciousness for a period of time, and that when he regained consciousness, he was on the floor inside of his cell, bleeding profusely.  (*Id.* at 5.)

An inmate porter, "Cephas," found Plaintiff on the floor bleeding and ran to the "bubble" to tell Ramdeen of Plaintiff's condition and that Plaintiff needed emergency medical help.  (*Id.* at 7.)[3]  However, Plaintiff claims, that no doctor, nurse, or medical personnel responded and that he was left to bleed out, with no help.  (*Id.*)  In addition, Plaintiff asserts that Ramdeen had no idea that Plaintiff had been assaulted inside of the cell that Ramdeen opened.  (*Id.*)

Eventually Officer Joanette saw Plaintiff bleeding on the floor of the cell and ran to the bubble for help, where she was told that Plaintiff would need to go to the infirmary for medical assistance.  (*Id.* at 7–8.)  Officer Joanette helped Plaintiff get up and go to the infirmary, where he lost consciousness.  (*Id.* at 8.)  He was later taken to Putnam Hospital.  (*Id.*)  The deep laceration on Plaintiff's cheek was stitched, and he was referred to Westchester Hospital for

---

[3] Plaintiff explains that the "bubble" is a station in which the "A" officer operates.  (*Id.* at 7.)  It is located at the front of each block and has metal bars, with clear glass that allows the "A" officer to see the entire cell block.  (*Id.*)  The Plaintiff also describes the process of opening a cell gate from inside the bubble.  To open a cell, an officer: (1) must gain access to enter the bubble, which requires a key; (2) must gain access to the lock box, which requires access to a different key; (3) must locate the cell number inside of the lock box; and (4) must grab the metal lever and pull it down.  (*Id.*)  On the day of Plaintiff's alleged assault, Plaintiff claims that Ramdeen was working as the "A" officer in the bubble.  (*Id.* at 15.)

"general surgery on the missing part of [his] nose" and was told to be careful of infection. (*Id.*) Plaintiff did not receive surgery. (*Id.* at 8, 11.) Instead, Plaintiff was transferred back to Green Haven. (*Id.* at 8.)

Upon return, Plaintiff was placed on the second-floor infirmary. (*Id.*) Plaintiff asserts that he was confined in a cell that was built exclusively for inmates that are suspected of smuggling contraband in the facility. (*Id.*) Plaintiff claims that within the cell he was: (1) housed with an unflushable toilet and broken window; (2) deprived of a blanket and pillow; (3) not allowed to leave his cell; and (4) denied meals compliant with his faith's dietary restrictions. (*Id.*)

Plaintiff states that he complained about these issues to multiple officers, including Polanco. (*Id.* at 8, 19.) Some of the officers acknowledged the cold and other problems but indicated that they were acting on orders from their superiors and that Plaintiff should complain to Royce. (*Id.* at 8–9.) Plaintiff contends that he took multiple steps to address his living conditions, including writing three letters to Royce and speaking to him on December 17 and 19, 2020. (*Id.* at 9.) On both occasions, Plaintiff asserts, that he reminded Royce of the December 16 incident, and the various issues in his cell. (*Id.*) Plaintiff states that in response to Plaintiff's complaints, Royce told him that he cared only about three things, including that Plaintiff was alive, was not escaping, and did not injure the officers, and that anything other than that was secondary. (*Id.*)

On December 19, 2020, Plaintiff was moved to a different cell. (*Id.* at 10.) Plaintiff claims that the new cell also had a broken window and was even colder than the first cell. (*Id.*) Plaintiff still did not receive a blanket or pillow, and had no recreation or religious meals, though he was able to flush the toilet in the new cell. (*Id.*) Plaintiff wrote letters to Russo requesting

better living conditions.  (*Id.*)  Plaintiff also spoke to Russo about the conditions he was living in, but Russo said he could not help Plaintiff and did not want to get involved. (*Id.*)  Over the course of the next few days, Plaintiff continued to speak to other personnel about these issues in his cell but received no help.  (*Id.*)

After staying in the second cell for a few more days, Plaintiff was transferred to a room shared with three other men.  (*Id.* at 11.)  Plaintiff claims that one of the inmates in that room was receiving special diet meals.  (*Id.*)  Plaintiff spoke with Royce, Russo, and Polanco "multiple times informing each of them[] that the inmate next to Plaintiff['s] bed [is] receiving his diet meals[] and for Plaintiff to be denied his religious diet meals . . . is . . . discrimination." (*Id.*) However, Plaintiff asserts that nothing came out of his conversations.  (*Id.*)  Plaintiff did not receive religious meals for thirty-eight days.  (*Id.*)

During this time, Plaintiff contends, he was also requesting Royce and Russo to transfer Plaintiff to Westchester Hospital for a general surgery on Plaintiff's nose, which both Royce and Russo refused.  (*Id.*)  Eventually, Plaintiff's wound got infected, and he was rushed to Westchester Hospital, where the wound was cleaned before he returned to Green Haven.  (*Id.*) Thereafter, Plaintiff was kept on the second-floor infirmary for over three weeks before his transfer was approved by Royce and Russo.  (*Id.*)  Plaintiff was released from the second-floor infirmary in January 2021, and was sent back to the same cell in which he was assaulted.  (*Id.*)

### 2.  Photos of Plaintiff's Injuries

On January 24, 2021, Plaintiff was called to the ID room for a new ID picture.  (*Id.* at 12.)  In the room, Plaintiff saw that there were photographs of his injuries posted on the wall. (*Id.*)  Plaintiff requested the photos be taken down.  (*Id.*)  An officer responded, telling him that

"these pictures [were] obtained through [FOIL], therefore, [the officer had] the right to possess them, and the right to put them anywhere [he] wish[ed].  (*Id.*)

Plaintiff wrote to Russo, informing him of the photos of Plaintiff on the wall in the ID room and requesting that they be taken down.  (*Id.*)  On January 27, 2021, Plaintiff spoke to Russo about the photos and again requested that they be taken down.  (*Id.*)  Russo told Plaintiff that the officer had obtained the pictures of Plaintiff's injuries through FOIL, that the officer could "post them wherever he want[ed]."  (*Id.*)  Plaintiff explained to Russo that allowing the photos to be posted on the wall was humiliating to Plaintiff and caused him mental stress.  (*Id.*)  Russo replied that there was nothing he could do about that.  (*Id.*)  Plaintiff continue speaking to other facility personnel in effort to have those photos removed from the ID room, but he was unsuccessful.  (*Id.*)

### 3.  Misbehavior Report

Plaintiff contends that, in connection with the incident leading to Plaintiffs injuries, Polanco prepared a Misbehavior Report ("MBR") on December 16, 2020, charging Plaintiff with: (1) fighting; (2) violent conduct; and (3) refusing a direct order, all in violation of applicable rules.  (*Id.* at 20–21; Ex. E (MBR)).  Plaintiff alleges that the MBR was false and that he was denied the right to appear and testify on his own behalf at the ensuing disciplinary hearing.  (*See* Compl. at 20–21; *but see* Ex. F at 3 (disciplinary hearing report noting that Plaintiff "refused to attend" the hearing).)  Plaintiff claims that after the hearing was conducted, and Plaintiff was found guilty of the charges in the MBR, Plaintiff requested to have an opportunity to hear the tape of the hearing.  (*Id.* at 21.)  In an effort to receive the tape, he wrote to and spoke to both Royce and Russo, wrote to the record access officer, wrote multiple letters

to the FOIL office, and appealed to the Central Office Review Committee ("CORC").  (*Id.*)
However, despite his efforts, Plaintiff asserts that he never received the tape.  (*Id.*)

### 4.  Plaintiff's Grievance

Plaintiff also states that his personal property, food, and sneakers were destroyed without
his authorization.  (*Id.* at 22.)  He filed a grievance regarding this issue, which was denied.  (*Id.*)
He appealed at various levels, but all his appeals were denied.  (*Id.*)  Plaintiff claims that the
Parties denying his grievance and the subsequent appeals ignored the truth and made their
decision in order to support another officer.  (*Id.*)  Plaintiff contends that such decisions
encourage officers to engage in an unlawful pattern and that, overall, the inmates do not benefit
from the grievance program.  (*Id.* at 22–23.)

### B.  Procedural History

Plaintiff filed his Complaint on May 11, 2022, (*see* Compl.), along with a request to
proceed in forma pauperis ("IFP"), (*see* Dkt. No. 1).  On May 12, 2022, the Court granted
Plaintiff's IFP application.  (*See* Dkt. No. 4.)  On May 13, 2022, the Court issued an Order of
Service directing, inter alia, "issue summonses for Defendants . . . , complete the USM-285
forms with the addresses for these defendants, and deliver to the [USMS] all documents
necessary to effect service."  (Dkt. No. 6.)

 On August 4, 2022, eleven days before the time to serve expired (August 15, 2022),
Plaintiff filed a letter with the Court stating that he did "not receive a notice from the [USMS],
[]or the Court [that] the Summons and Complain[t] [had] been served to the [D]efendants" and
therefore, the Plaintiff requested "a 45 day[] extension of time for the  [USMS] to serve each
Defendant . . . ."  (Dkt. No. 13.)  The Court granted this request on August 11, 2022.  (*See* Dkt.
No. 14).

On September 21, 2022, the NYSOAG filed a letter, on behalf of Polanco, requesting an extension of time to respond to the Complaint because "the Complaint names additional [D]efendants who have not yet been served" and "[t]he requested extension would provide additional time for these [D]efendants to be served with the Complaint, and for the [D]efendants who seek representation from this Office to request such representation." (Dkt. No. 17.)  On the same day, the Court granted the extension. (*See* Dkt. No. 18.)

On September 23, 2022, six days before the service deadline (September 29, 2022), Plaintiff filed another letter, seeking "a 2nd 45 day[] extension of time for the [USMS] to serve each [D]efendant," because Plaintiff still had "not received a notice from the [USMS] []or the Court [that] the Summons and Complaint [had] been served to the [D]efendants." (Dkt. No. 19.)  The Court granted Plaintiff "an extension of 30 days" on September 28, 2022. (Dkt. No. 20.)

There is no indication, on the docket or otherwise, that any of the remaining unserved Defendants, Royce, Russo, or Ramdeen, were served during this thirty-day extension. (*See generally* Dkt.)

On November 9, 2022, the NYSOAG filed a letter with the Court: (1) advising it was "unaware of service being effectuated" on Royce, Russo, or Ramdeen; and (2) asking that Polanco's time to respond to the Complaint and provide Local Civil Rule 33.2 discovery be extended from November 18, 2022 to and including January 17, 2023. (*See* Dkt. No. 23.)  The extension was sought to "preserve Polanco's rights and allow the Court to take whatever action it deem[ed] necessary regarding the unserved parties." (*Id.*)  The Court granted the request and directed Plaintiff "to explain whether he intended to seek and extension of time to serve" Royce, Russo, and Ramdeen. (Dkt. No. 27.)

That same day—after the NYSOAG letter motion was filed, but before the endorsement—the Court docketed a letter from Plaintiff.  (*See* Dkt No. 26.)  The letter, dated October 27, 2022, asked for another "30 day[] extension of time for service."  (*Id.*)

On November 14, 2022, Plaintiff filed another letter with the Court, asking that it deny NYSOAG's request for an extension on Polanco's time to respond to the Complaint.  (*See* Dkt. No. 28.)  The Court responded with a memo endorsement, stating that "[t]he relief sought" by Plaintiff "is moot, as the Court [already] granted Defendant's request."  (Dkt. No. 29.)

On December 20, 2022, fifty days after the last deadline set by the Court and twenty days after the deadline requested by Plaintiff on October 27, 2022—Plaintiff requested another "30 days extension of time for the [USMS] to serve the [D]efendants with the Summons and Complaint."  (Dkt. No. 30.)  The Court granted this request on January 5, 2023.  (Dkt. No. 31.)

On January 10, 2023, the NYSOAG filed a letter with the Court, requesting that Polanco's time to respond to the Complaint and provide Local Civil Rule 33.2 discovery be extended from January 17, 2023 to March 20, 2023.  (*See* Dkt. No. 32.)  The NYSOAG explained, as it did in its previous request, that the extension would preserve Polanco's rights and account for the issues related to serving Russo, Ramdeen, and Royce.  (*Id.*)  The Court granted that request the same day, noting "that there will be no more extensions of the time to serve or . . . answer."  (Dkt. No. 34.)

On February 8, 2023, two days after the final deadline set by the Court, Plaintiff filed a letter acknowledging the Court's previous Order, which stated that no more extension would be granted, and as such, asking for "an order directing the [NYSOAG] to provide [t]he [USMS] the information necessary to serve" Royce, Russo, and Ramdeen.  (Dkt. No. 35.)

On March 20, 2023, the NYSOAG filed a pre-motion letter, requesting a pre-motion conference regarding Polanco's anticipated Motion to Dismiss.  (Dkt. No. 36.)  In addition, the letter opposed Plaintiff's request for an order directing NYSOAG to provide information necessary for service on the outstanding co-Defendants.  (*Id.*)  On the same day, in lieu of holding a pre-motion conference, the Court entered an order, setting a briefing schedule for Polanco's Motion to Dismiss.  (Dkt. No. 37.)  The Court also directed the Parties to include arguments related to the service of Russo, Royce, and Ramdeen in its submissions.  (*Id.*)

On April 20, 2023, Polanco filed the instant Motion.  (*See* P Not. of Mot.; Mem. of Law in Supp. of Polanco's Mot. to Dismiss ("P Mem.") (Dkt. No. 40).)  On May 25, 2023, five days after the deadline to submit, Plaintiff filed his opposition.  (*See* Mem. of Law in Opp. to Mot. to Dismiss ("Pl.'s Opp.") (Dkt. No. 45).)  Thereafter, on May 30, 2023, NYSOAG filed a letter requesting an extension of time to file its Reply, (*see* Dkt. No. 46), which the Court granted on the same day, (*see* Dkt. No. 48).  On June 22, 2023, Polanco filed his Reply.  (*See* Reply Mem. of Law in Supp. of Polanco's Mot. to Dismiss ("P Reply Mem.") (Dkt. No. 50).)

On September 14, 2023, NYSOAG filed a letter with this Court, stating the Royce and Russo were recently served, and requesting that the date by which all newly served Defendants must respond to the Complaint be extended.  (*See* Dkt. No. 52.)  The Court granted this request on the following day.  (*See* Dkt. No. 53.)

On October 12, 2023, the NYSOAG filed a pre-motion letter, requesting a pre-motion conference regarding Russo and Royce's anticipated Motion to Dismiss.  (Dkt. No. 56.)  The letter noted that Ramdeen had not been served yet.  (*See id.*)  On November 2, 2023, in lieu of holding a pre-motion conference, the Court entered an order, setting a briefing schedule for Russo and Royce's Motion to Dismiss.  (Dkt. No. 58.)

On November 29, 2023, Russo and Royce filed their Motion.  (*See* RR Not. of Mot. (Dkt. No. 59); Mem. of Law in Supp. of Russo and Royce's Mot. to Dismiss ("RR Mem.") (Dkt. No. 60).)  On January 1, 2024, Plaintiff filed a letter requesting a seven-day extension to submit his opposition, (*see* Dkt. No. 62), which the Court granted, (*see* Dkt. No. 63).  Plaintiff did not submit an opposition during this seven-day extension.  (*See generally* Dkt.)  However, on February 7, 2024, the Court received a packet of documents from Plaintiff, including a memorandum that recites the facts of his case and provides minimal argumentation supporting his claims, as well as various documents related to his case, all of which the Court considered in deciding this Motion.  The Court considers this Motion fully submitted.

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration adopted) (internal quotation marks and citation omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.*  (alteration adopted) (internal quotation marks and citation omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

12

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570.  However, if a plaintiff has not "nudged [his] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed."  *Id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" (alteration adopted) (internal quotation marks and citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Protection Resources, Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks and citation omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).  But when a plaintiff

proceeds pro se, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint." *Alsaifullah*, 2013 WL 3972514 at *4 n.3 (internal quotation marks and citation omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu*, 2010 WL 5186839 at *4 n.6 (italics omitted).  Moreover, where, as here, a plaintiff proceeds pro se, the Court must "construe[ ] [his] [complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (internal quotation marks and citation omitted). Notwithstanding a standard of review comparatively more lenient and favorable to pro se litigants, such treatment "does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks and citation omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics omitted) (internal quotation marks and citation omitted)).

   B.  Analysis

   Plaintiff asserts various claims arising from the events described above.  (*See generally* Compl.)  Construing Plaintiff's Complaint liberally and interpreting it to raise the strongest arguments that it suggests, the Court determines that Plaintiff brings the following claims: (1) a First Amendment claim regarding the alleged denial of religious meals; (2) an Eighth Amendment claim concerning a failure to protect; (3) an Eighth Amendment claim as to his conditions of confinement; (4) a Fourteenth Amendment claim with regard to a supposedly false MBR; and (5) a claim regarding failure to train and supervise.  (*See id.*)

Defendants Polanco, Royce and Russo move to dismiss each of Plaintiff's claims against them for failure to state a claim.  (*See* P Mem.; RR Mem.)  The Court begins by reviewing each of Plaintiff's claims. Thereafter, the Court turns to Plaintiff's request for an order regarding service on Defendant Ramdeen.

### 1.  Motion to Dismiss

#### a.  Free Exercise of Religion

Polanco, Royce and Russo argue that Plaintiff has failed to state a claim under the Free Exercise Clause of the First Amendment.  (*See* P Mem. at 7–8.)

It is well-established that the First Amendment affords inmates constitutional protection to practice their religion.  *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (holding that "[i]nmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion" (internal quotation marks and citations omitted)); s*ee also Kravitz v. Purcell*, 87 F.4th 111, 127 (2d Cir. 2023) (same).

However, because of inmates' unique circumstances, their Free Exercise rights are necessarily somewhat more constrained than those of other persons.  *See Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990) ("Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, are the interests of prison officials charged with complex duties arising from administration of the penal system."  (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974))).  Accordingly, "a generally applicable policy will not be held to violate a plaintiff's right to free exercise of religion if that policy is reasonably related to legitimate penological interests."  *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010) (internal quotation marks and citation omitted).

Thus, "to assess a free exercise claim, a court must determine (1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers legitimate penological objectives." *Kravitz*, 87 F.4th at 128 (alterations adopted) (quoting *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988)).  As long as a restriction on an inmate's religious practice "is reasonably related to legitimate penological interests," it does not violate the First Amendment.  *Tripathy v. McCloskey*, No. 21-CV-6584, 2021 WL 5771129, at *9 (S.D.N.Y. Dec. 6, 2021) (quoting *Pugh v. Goord*, 571 F. Supp. 2d 477, 494 (S.D.N.Y. 2008)).

Here, Plaintiff alleges that he is a Rastafarian and possesses a religious diet card, (*see* Compl. at 19), and that despite showing Polanco, Royce, and Russo his religious diet card and/or explaining to them that he needs special religious meals, Plaintiff was denied meals consistent with his faith for at least thirty-eight days. (*See id.* at 8, 10–11, 17–19, 25–26).  Polanco, Royce, and Russo do not seem to contest the sincerity of Plaintiff's religious beliefs, (*see* P Mem. at 7–8), therefore, the Court will assume for the purpose of resolving the instant Motions that Plaintiff's religious beliefs are sincerely held.  *Porter v. Bunch*, No. 16-CV-5935, 2019 WL 1428431, at *15 (S.D.N.Y. Mar. 29, 2019) (assuming religious beliefs are sincerely held, where defendants do not contest sincerity).

Polanco, Royce, and Russo do, however, argue that Plaintiff "offers no elaboration about, explanation of, or narrative describing the meals, their role in his faith, or any particular observances at this time," and that accordingly, his claim must "be dismissed for failure to explain how these undefined meals were important or central to Plaintiff's faith."  (P Mem. at 8 (internal quotation marks and citation omitted).)  However, contrary to Polanco, Royce and

Russo's argument, Plaintiff claims that he explained to the officers "that Plaintiff is a R[astafarian] and cannot eat regular food prepa[r]ed for the general population because the food [is] not prepa[r]ed according to the R[asta] [r]eligion, which render[s] the food unclean for the consumption of a  R[astafarian]."  (Pl.'s Opp. at 5.)  Moreover, Plaintiff claims that "any R[asta] who fail[s] to live by," Rasta principles, including the consumption of clean food, prepared according to the Rasta faith, "is considered a sinner."  (*Id.* at 8.)

Based on this record, the Court concludes that Plaintiff's allegations about the denial of meals consistent with his religion plausibly states a claim that his religious rights were infringed upon absent legitimate penological interests.  *Kravitz*, 87 F.4th at 128 (finding prisoner who was unable to observe a religious holiday due to corrections officers' conduct had shown a burden on his sincere religious beliefs); *Rogers v. Fontaine*, No. 23-CV-1350, 2024 WL 83338, at *3 (D. Conn. Jan. 8, 2024) (holding that plaintiff's allegations about his consistent deprivation of certain religious materials and difficulty in practicing his religious rituals suggest that his religious rights were being impinged upon absent legitimate penological reason); *see also McEachin v. McGuinnis*, 357 F.3d 197, 203 (2d Cir. 2004) ("[C]ourts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights."); *Crichlow v. Fischer*, No. 12-CV-7774, 2015 WL 678725, at *3 (S.D.N.Y. Feb. 17, 2015) ("Generally, an inmate is entitled to a reasonable accommodation of his religious beliefs, including religious dietary beliefs.").

Accordingly, the Court determines that at this stage, Plaintiff has alleged a plausible claim pursuant to the Free Exercise Clause of the First Amendment against Polanco, Royce and Russo.

b.  Failure to Protect

Royce and Russo move to dismiss Plaintiff's failure to protect claim, arguing that Plaintiff has not adequately pleaded such a claim.  (*See* RR Mem. at 4–8.)  Royce and Russo admit, for purposes of their Motion, that Plaintiff has adequately alleged a sufficiently serious injury, namely, a deep laceration to his left cheek requiring stitches and damage to the bottom half of his nose requiring surgery.  (*See* RR Mem. at 5 (citing Compl. at 5, 8).)  However, Royce and Russo argue that Plaintiff has failed to establish that they acted with deliberate indifference to his health or safety.  (*See id.*)

"The Eighth Amendment, which prohibits cruel and unusual punishment, requires prison officials to 'take reasonable measures to guarantee the safety of inmates in their custody.'" *Marshall v. Griffin*, No. 18-CV-6673, 2020 WL 1244367, at *8 (S.D.N.Y. Mar. 16, 2020) (quoting *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996)); *see also Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (same).  "Prison officials are liable for harm incurred by an inmate if they act with deliberate indifference to the inmate's safety."  *Id.* (alteration adopted) (quoting *Price v. Oropallo*, No. 13-CV-563, 2014 WL 4146276, at *4 (N.D.N.Y. Aug. 19, 2014)).

"To satisfy the deliberate indifference standard, a plaintiff must allege that (1) 'he is incarcerated under conditions posing a substantial risk of serious harm' and (2) 'the defendant prison officials possessed sufficient culpable intent.'"  *Smolen v. Brown*, No. 18-CV-7621, 2023 WL 6199094, at *7 (S.D.N.Y. Sept. 22, 2023) (quoting *Hayes*, 84 F.3d at 620).  "The first prong is objective and requires that prison officials provide inmates with 'basic human needs, one of which is reasonable safety.'"  *Id.* (quoting *Helling v. McKinney*, 509 U.S. 25, 33 (1993)). "The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier

inquiry." *Id.* (quoting *Hayes*, 84 F.3d at 620). "Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." *Id.* (quoting *Hayes*, 84 F.3d at 620). Moreover, "[c]ourts have found that, when an inmate informs corrections officers about a specific fear of assault and is then assaulted, this is sufficient to proceed on a claim of failure to protect." *Albritton v. Morris*, No. 13-CV-3708, 2016 WL 1267799, at *13 (S.D.N.Y. Mar. 30, 2016); *see also Bright v. Annucci*, No. 18-CV-11111, 2021 WL 4461682, at *15 (S.D.N.Y. Sept. 28, 2021) (same).

Here, Plaintiff alleges that in November 2020, Plaintiff began receiving "threat notes" on his bed every time he returned to his cell from a "call out" or recreation. (Compl. at 13.) As a result, Plaintiff wrote multiple letters to Royce and spoke to him on various occasions about these notes. (*Id.*) Plaintiff claims that he also wrote multiple letters to Russo, sending along with the letters some of the actual notes, and spoke with him a few times about the threats. (*Id.*) In addition to informing Royce and Russo about the notes and that he feared for his safety, Plaintiff claims that he told all the officers that worked on his cell block about the notes, including Ramdeen. (*Id.* at 15–16.) Moreover, Plaintiff asked both Royce and Russo to investigate the matter and requested to be moved out of his current cell block for safety reasons. (*Id.* at 13.) However, Plaintiff was not moved. (*Id.*) Thereafter, in December 2020, Plaintiff was assaulted in his cell. (*Id.* at 4–5.)

At the pleading stage, the Court concludes that the above allegations are sufficient to state a failure to protect claim against Defendants Royce and Russo. Plaintiff provided sufficiently detailed information (about the notes he received) about a specific threat (in his cell) and has alleged he was attacked in a way that was consistent with the specific threats that he

alleges Royce and Russo ignored.  Such allegations plausibly state a failure-to-protect claim.  *See Bright*, 2021 WL 4461682 at *15 (holding that plaintiff had adequately pleaded a failure to protect claim against certain defendants, where the plaintiff warned certain prison officials about foreseeable threats to his safety, and after officers failed to address the plaintiff's concerns, plaintiff was assaulted); *see also Sheffer v. Fleury*, No. 18-CV-1180, 2019 WL 4463672, at *8 (N.D.N.Y. Sept. 18, 2019) (finding the plaintiff's allegations sufficient where he told the defendant that he "feared for his safety," even though he did not allege that he specifically feared a sexual assault); *Stephens v. Venettozzi,* No. 13-CV-5779, 2016 WL 929268, at *19 (S.D.N.Y. Feb. 24, 2016) ("Courts have found that a prisoner validly states an Eighth Amendment claim based on a failure to protect when he alleges that he informed corrections officers about a specific fear of assault and is then assaulted." (internal quotation marks and citation omitted)), *adopted by* 2016 WL 1047388 (S.D.N.Y. Mar. 10, 2016); *Beckles v. Bennett*, No. 05-CV-2000, 2008 WL 821827, at *18 (S.D.N.Y. Mar. 26, 2008) (explaining that a failure-to-protect claim survived summary judgment because the plaintiff had "presented evidence that he made [the defendant] aware of a specific threat to his safety and that several hours later he was seriously assaulted").

Unlike cases where inmates have merely made conclusory allegations to correction officers that they "feared for [their] safety," *Haughton v. Clinton*, No. 15-CV-1160, 2015 WL 9244398, at *2 (S.D.N.Y. Dec. 17, 2015), here, Plaintiff has alleged that he specifically made both Royce and Russo aware of the threatening notes by writing them letters and speaking to them and requested to be moved out of his current cell block for safety reasons, and yet, Royce and Russo did nothing to address Plaintiff's specific and verifiable concerns, (*see* Compl. at 13). *See Villa v. Westchester County*, No. 19-CV-428, 2020 WL 4505968, at *7 (S.D.N.Y. Aug. 5,

2020) (holding that plaintiff plausibly pleaded a failure to protect claim, where plaintiff alleged that he told an officer about specific threats to his safety and that he wanted to be housed separately for safety reasons, but officer took no action to separate plaintiff from potential assailant).

Accordingly, the Court determines that Plaintiff has adequately pled a failure to protect claim, and therefore, Royce and Russo's Motion to Dismiss this claim is denied.

c. Conditions of Confinement

Polanco, Royce and Russo move to dismiss Plaintiff's claim concerning his conditions of confinement.  (*See* P Mem. at 9–15.)  Specifically, they contend that Plaintiff has failed to allege sufficiently serious conditions or deliberate indifference on Polanco, Royce or Russo's part.  (*See id.*)

It is axiomatic that "the conditions of a prisoner's confinement can give rise to an Eighth Amendment violation."  *Collins v. Fischer*, No. 15-CV-103, 2018 WL 1626528, at *5 (S.D.N.Y. Mar. 30, 2018) (alteration adopted) (quoting *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (per curiam)).  "Although the Constitution does not require 'comfortable' prison conditions, the conditions of confinement may not 'involve the wanton and unnecessary infliction of pain.'"  *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  In such cases, a prisoner may prevail only where he alleges that: "(1) objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively, the defendant official acted with a sufficiently culpable state of mind, such as deliberate indifference to inmate health or safety."  *Stapleton v. Pagano*, No. 19-CV-952, 2020 WL 4606320, at *5 (S.D.N.Y. Aug. 11, 2020) (quoting *Walker*, 717 F.3d at 125).

"To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Id.* (quoting *Walker*, 717 F.3d at 125); *see also Seymore v. Dep't of Corr Servs.*, No. 11-CV-2254, 2014 WL 641428, at *3 (S.D.N.Y. Feb. 18, 2014) ("[T]he Second Circuit . . . has explained that because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a conditions-of-confinement claim." (alteration adopted) (internal quotation marks and citations omitted)). "Thus, prison officials violate the Constitution when they deprive an inmate of his basic human needs such as food, clothing, medical care, and safe and sanitary living conditions." *Collins*, 2018 WL 1626528 at *5 (internal quotation marks and citation omitted). Moreover, conditions of confinement may be aggregated to rise to the level of a constitutional violation, but "only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (noting that "low cell temperature at night combined with a failure to issue blankets" may establish an Eighth Amendment violation).

Under the "subjective" requirement, a defendant "'cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Phelps*, 308 F.3d at 185–86 (quoting *Farmer*, 511 U.S. at 837). "A prison official may be found to have had a sufficiently culpable state of mind if he participated directly in the alleged event, or learned of the inmate's complaint and failed to remedy it, or created or permitted a policy that harmed the inmate, or acted with gross negligence in managing subordinates." *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001); *see also*

*Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, at *4 (S.D.N.Y. Feb. 17, 2015) (same); *Reid v. Nassau Cty. Sheriff's Dep't*, No. 13-CV-1192, 2014 WL 4185195, at *17 (E.D.N.Y. Aug. 20, 2014) (same). "Allegations of mere negligence by prison officials will not support a claim under the Eighth Amendment." *Thomas v. Demeo*, No. 15-CV-9559, 2017 WL 3726759, at *5 (S.D.N.Y. Aug. 28, 2017).

Here, Plaintiff claims that for three consecutive days he was housed in a cell that had a broken glass window rendering the room cold, had feces in the toilet, and lacked blankets or a pillow. (*See* Pl.'s Opp. at 14.) In addition, Plaintiff contends that he was confined to the cell twenty-four hours a day and was denied religious meals while confined. (*Id.*) Thereafter, Plaintiff was transferred to a different cell, where the same violations persisted, except for feces in the toilet. (*Id.*) Finally, Plaintiff was moved to a third cell with three other men, for over a month, where he was denied religious meals and recreation. (*Id.*)

The Court need not decide whether such allegations suggest a sufficiently extreme deprivation to state a constitutional violation, because in any event, Plaintiff's claim cannot survive due to a failure "to allege any facts to support the subjective element of the claim, i.e., that [Polanco, Royce and Russo] knew of and disregard[ed] an excessive risk to inmate safety." *Bryant v. Capra*, No. 18-CV-10198, 2020 WL 508843, at *11 (S.D.N.Y. Jan. 31, 2020) (citation and quotation marks omitted).

The Court addresses the subjective element as to Plaintiff's time in each cell. With regard to the first cell, Plaintiff states that he complained about the various issues in his cell to multiple officers, including at least Polanco and Royce. (*See* Compl. at 8–9, 19.) However, Plaintiff also contends he was moved from the first cell to the second, on December 19, 2020, on the same day he spoke to Royce—albeit the second time he spoke to him—about these issues.

23

(*Id.* at 9–10.)  As to the second cell, even though Plaintiff claims that he complained to Russo and other personnel regarding the second cell to no avail, Plaintiff also asserts that he was transferred to a different room a few days later.  (*Id.* at 11.)  As for his time in the last room, Plaintiff only contends that he informed Polanco, Royce, and Russo about the lack of religious meals.  (*Id.*)  As to any other issues he experienced while in the third cell, including a lack of recreation, Plaintiff alleges that he complained to multiple officers and supervisors, but does not allege that he made Polanco, Royce or Russo aware of these conditions.  (Pl.'s Opp. at 14–15.)

Based on these allegations, the Court determines that Plaintiff has failed to adequately plead that Polanco, Royce and Russo acted with deliberate indifference.  Rather, allegations that Plaintiff was moved from the first and second cell within a matter of a few days, following his complaints, run contrary to any plausible claim against about Polanco, Royce and Russo that they knew of and disregarded an excessive risk to Plaintiff's safety.  *See Price v. Koenigsmann*, No. 19-CV-4068, 2020 WL 4274079, at *5 (S.D.N.Y. July 24, 2020) ("'Deliberate indifference is a mental state equivalent to subjective recklessness,' and 'requires that the charged official act or *fail to act* while actually aware of a substantial risk that serious inmate harm will result.'" (emphasis added) (quoting *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014)); *see also Jackson v. Sullivan County.*, No. 16-CV-3673, 2018 WL 1582506, at *4 (S.D.N.Y. Mar. 27, 2018) (finding that plaintiff failed to adequately allege that an official acted with deliberate indifference regarding the challenged condition where the complaint did not contain "any allegation suggesting that officials recklessly failed to act with reasonable care to mitigate the risk that the condition posed to [p]laintiff even though they knew, or should have known, that the condition posed an excessive risk to his health or safety"); *Williams v. Carbello*, 666 F. Supp. 2d 373, 380

(S.D.N.Y. 2009) (holding that plaintiff did not satisfy the subjective prong, where there were allegations that officer responded to plaintiff's complaint).

Moreover, with regard to the lack of recreation while in the third room, Plaintiff fails to assert that Polanco, Royce or Russo were aware of this condition, thus dooming this claim. *See Collins*, 2018 WL 1626528 at *8 (dismissing conditions of confinement claim where the plaintiff "fail[ed] to identify an individual who is responsible for the conditions of which he complains"); *Thomas v. DeCastro*, No. 14-CV-6409, 2018 WL 1322207, at *14 (S.D.N.Y. Mar. 13, 2018) (dismissing Eighth Amendment conditions of confinement claim where the complaint "fail[ed] to allege that any [d]efendant was aware of facts from which the inference could be drawn that the conditions . . . specifically posed a substantial risk of serious harm to [the p]laintiff, or that [the d]efendants in fact drew such an inference" (internal quotation marks and citation omitted)).

Finally, with regard to the lack of religious meals, such allegations are addressed with regard to Plaintiff's First Amendment claim. *See Supra* Section II.B.1.a.

Accordingly, because Plaintiff cannot meet the subjective prong, Plaintiff's conditions of confinement claim is dismissed. *Bryant*, 2020 WL 508843 at *11 (dismissing Eighth Amendment conditions of confinement claim for failure to allege facts suggesting that the defendants possessed the requisite state of mind); *see also Clay v. Lee*, No. 13-CV-7662, 2019 WL 1284290, at *7 (S.D.N.Y. Mar. 20, 2019) (dismissing conditions of confinement claim where the plaintiff failed to "show that any particular [d]efendant acted with any mental state, let alone the 'subjective recklessness' required to state deliberate indifference" (quoting *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006))).

### d.  False MBR

Polanco moves to dismiss Plaintiff's claim regarding the allegedly false MBR for failure
to state a claim.  (*See* P. Mem. at 15–16.)

"The Second Circuit has long held that a prison inmate has no constitutional right to be
free from being falsely accused in a misbehavior report."  *Akinlawon v. Polonco*, No. 21-CV-
2621, 2023 WL 6216724, at *18 (S.D.N.Y. Sept. 25, 2023) (alteration adopted) (quoting *Thomas
v. Calero*, 824 F. Supp. 2d 488, 499 (S.D.N.Y. 2011)); *see also Boddie v. Schnieder*, 105 F.3d
857, 862 (2d Cir. 1997) (same); *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)
(observing that a "prison inmate has no constitutionally guaranteed immunity from being falsely
or wrongly accused of conduct which may result in the deprivation of a protected liberty
interest").  There are, however, two exceptions to this rule.  A corrections officer's false
misbehavior report is actionable where an inmate is "able to show either (1) that he was
disciplined without adequate due process as a result of the report; or (2) that the report was
issued in retaliation for exercising a constitutionally protected right."  *Willey v. Kirkpatrick*, 801
F.3d 51, 63 (2d Cir. 2015); *see also Cook v. Quattrocchi*, No. 19-CV-11659, 2020 WL 564082,
at *2 (S.D.N.Y. Feb. 5, 2020) (same).

Here, Plaintiff has failed to state an actionable violation.  As an initial matter, Plaintiff
has not made any allegations to demonstrate that the report was issued in retaliation for
exercising a constitutionally protected right.  Rather, Plaintiff's allegations and the MBR show
that it was issued in connection with the incident resulting in Plaintiff's alleged assault.  (*See*
Compl. at 20–21; Ex. E (MBR)).  As for being disciplined without adequate due process as a
result of the report, although Plaintiff claims that he was denied the right to appear and testify on
his own behalf at the disciplinary hearing, (*see* Compl. at 20–21), the disciplinary hearing report

26

reflects that Plaintiff refused to attend the hearing, (*see* Ex. F at 3).  But even crediting Plaintiff's

allegation that he was denied the opportunity to attend the hearing, Plaintiff does not allege any

disciplinary action taken against him as a result of the MBR or the subsequent hearing.  (*See*

*generally* Compl.)

As such, Plaintiff's claim in connect with the MBR is dismissed without prejudice.  *See*

*Brown v. Venettozzi*, No. 18-CV-2628, 2019 WL 4194432, at *5 (S.D.N.Y. September 4, 2019)

(holding that a defendant's allegedly false misbehavior report and testimony did not violate the

plaintiff's constitutional rights where the plaintiff had not been "disciplined without adequate due

process," and the plaintiff did not allege that the false report was issued in retaliation for his

exercise of a constitutionally protected right); *Jackson v. Jackson*, No. 16-CV-8516, 2018 WL

1918626, at *3 (S.D.N.Y. Apr. 20, 2018) (holding that a plaintiff's claim "stemming from [an]

allegedly false misbehavior report" failed to state a claim "because the factual allegations d[id]

not support the contention that [the] [p]laintiff was disciplined without adequate due process as a

result of the allegedly false report, or that the report was issued in retaliation for exercising a

constitutionally protected right").

### e.  Failure to Train and Supervise

Finally, Polanco and Royce move to dismiss Plaintiff's claim concerning a failure to train

and supervise.  (P Reply Mem. at 7–8.)  Specifically, they contend that Plaintiff's allegations

amount to nothing more than a respondeat superior theory of liability, upon which a Section

1983 action cannot rest.  (*Id.*)  The Court agrees that Plaintiff's claim should be dismissed, but

for reasons different from those advanced by Polanco and Royce.

Plaintiff does not offer a single fact to support his claim that Polanco and Royce failed to

train and/or supervise any subordinates.  Instead, Plaintiff summarily states that Royce "fail[ed]

to properly train his subordinates, and adequately [s]upervise them," (Compl. at 24), and that

Polanco "fail[ed] to adequately [s]upervise his subordinates," (*id.* at 26).  Such general and

conclusory allegations regarding a failure to train and/or supervise, without explaining how

Polanco and Royce failed to do so, or which subordinates they failed to train and/or supervise,

does not satisfy even the most minimal pleading standards.  *Keaton v. Ponte*, No. 16-CV-3063,

2017 WL 3382314, at *6 (S.D.N.Y. Aug. 4, 2017) ("When ruling on a motion to dismiss a pro se

plaintiff's complaint, a court must construe the complaint broadly, and interpret it to raise the

strongest arguments that it suggests.  Nonetheless, even a pro se plaintiff's factual allegations

must be at least enough to raise a right to relief above the speculative level to survive a motion to

dismiss." (internal quotation marks and citations omitted)); *Terry v. N.Y.C./D.O.C./V.C.B.C.

Warden Carter*, No. 21-CV-8995, 2023 WL 199594, at *3 (S.D.N.Y. Jan. 17, 2023) ("[T]he

liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with

relevant rules of procedural and substantive law." (quoting *Bell*, 980 F. Supp. 2d at 559)); *Harris

v. Viau*, No. 17-CV-9746, 2019 WL 1978596, at *3 (S.D.N.Y. May 3, 2019) (same); *see also

Dunham v. City of New York*, 295 F. Supp. 3d 319, 331 (S.D.N.Y. 2018) ("Plaintiff's bare

allegation that [the defendant] is liable for failing to supervise his subordinates fails to allege

sufficient facts to state a claim on a failure-to-supervise theory."); *Brooks v. Prack*, 77 F. Supp.

3d 301, 313 (W.D.N.Y. 2014) (holding that plaintiff's conclusory allegation that defendant

officers "were grossly negligent in supervising their subordinates" failed to state claim for

supervisory liability in Section 1983 action, absent explanation as to how officers failed to

supervise subordinates, or which subordinates they failed to supervise (alteration adopted));

*Parris v. N.Y.S. Dep't of Corr. Servs.*, 947 F.Supp.2d 354, 364 (S.D.N.Y. 2013) ("Conclusory,

unsupported allegations of gross negligence or the existence of a policy are simply insufficient to

establish liability of supervisory prison officials under [Section] 1983." (alterations adopted) (internal quotation marks and citation omitted)).

Without any further allegations, the Court does not speculate as to whether Plaintiff's assertions amount to a respondeat superior theory of liability, as Royce and Polanco suggest, or some other kind of claim. Instead, the Court dismisses without prejudice to allow Plaintiff to add allegations to clarify his failure to train and supervise claim.

### 2.  Request for Order Regarding Service

The Court now turns to Plaintiff's request for an order directing the NYSOAG to provide the information necessary to serve Ramdeen. (*See* Dkt. No 35.)

Typically, where, as here, a plaintiff proceeds IFP, he or she is entitled to rely on service by the U.S. Marshals. *See* Fed. R. Civ. P. 4(c)(3); *see also Romandette v. Weetabix Co., Inc.*, 807 F.2d 309, 311 (2d Cir. 1986). Although Rule 4(m) specifies that defendants not served within ninety days of the filing of a complaint should be dismissed, *see* Fed. R. Civ. P. 4(m), district courts "have discretion to grant extensions, and may do so even in the absence of good cause." *Meilleur v. Strong*, 682 F.3d 56, 61 (2d Cir. 2012) (citation and quotation marks omitted).

Here, in an Order of Service dated May 13, 2022, the Court instructed the Clerk of Court to "complete the USM-285 forms with the addresses for [all the] [D]efendants, and deliver to the [USMS] all documents necessary to effect service." (Dkt. No. 6.) At the Court's instruction, Plaintiff relied on the USMS to carry out his service obligations. In fact, Plaintiff diligently wrote to the Court, on June 13, 2022, to inquire as to whether Plaintiff will receive a notification after the USMS serves Defendants, indicating that he was unaware of the status of service. (*See* Dkt. No. 9.) Thereafter, Plaintiff periodically wrote to the Court requesting an extension of time

29

for the USMS to serve Defendants, indicating each time that he did not receive notice as to whether the Defendants had been served. (*See* Dkt. Nos. 13, 19, 30.)  Following this Court's Order, stating that there would be no more extension on the time to serve, (*see* Dkt. No. 34), Plaintiff filed a letter with this Court, requesting an order directing the NYSOAG's office to provide the USMS with the information necessary to serve the unserved Defendants, (*see* Dkt. No. 35).

NYSOAG argues that Plaintiff's request is untimely and should not be granted due to a concern of piecemeal litigation that may result from granting the request at this juncture.  (*See* P Mem. at 17–18.)  The Court disagrees.

"[T]he Court has an obligation to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training," *Canady v. Correct Care Solutions*, No. 15-CV-4893, 2017 WL 4280552, at *10 (S.D.N.Y. Sept. 25, 2017) (internal quotation marks and citations omitted), as well as their lack of resources, *Valentin v. Dinkins*, 121 F.3d 72, 75 (2d Cir. 1997) ("From [Plaintiff's] place of incarceration, it is hard to see what investigative tools would be at his disposal to obtain further information on [Defendants'] identity.").  "Moreover, the Second Circuit has a 'clearly expressed preference that litigation disputes be resolved on the merits.'"  *Canady*, 2017 WL 4280552 at *10 (quoting *Mejia v. Castle Hotel, Inc.*, 164 F.R.D. 343, 346 (S.D.N.Y. 1996)); *see also Cody v. Mello*, 59 F.3d 13, 15 (2d Cir. 1995) (same).  To the extent NYSOAG raises a concern about piecemeal litigation, it does not properly articulate such an argument, and in any event, the Court concludes that Plaintiff's pro se status coupled with his diligent efforts to request extensions for time to serve Defendants, as noted above, warrant granting Plaintiff's request.  *May v. Levy*, 659 F. Supp. 3d 323, 334 (E.D.N.Y. 2023) ("[G]iven [p]laintiff's pro se status, [p]laintiff 'should be

30

granted special leniency regarding procedural matters,' particularly where, as here, she attempted service." (quoting *Thrall v. Cent. New York Reg'l Transp. Auth.*, 399 F. App'x 663, 666 (2d Cir. 2010) (summary order)); *see also McGee v. Haigh*, No. 13-CV-394, 2015 WL 1456612, at *16 (N.D.N.Y. Mar. 30, 2015) ("Plaintiff's pro se status entitles him to a certain degree of leniency insofar as service of process is concerned, and courts generally favor resolution of a case on its merits rather than on the basis of a procedural technicality."). Accordingly, the Court will exercise its discretion, and grant Plaintiff's request.

## III.  Conclusion

For the foregoing reasons, Polanco's Motion is granted in part and denied in part, Royce and Russo's Motion is granted in part and denied in part, and Plaintiff's request is granted.

Specifically, the Motions are denied with regard to Plaintiff's free exercise and failure to protect claims. The Motions are granted as to Plaintiff's conditions of confinement, false MBR, and failure to train and supervise claims, all of which are dismissed without prejudice. The dismissal is without prejudice because this is the first adjudication on the merits of Plaintiff's claims. *See Terry v. Incorporated Village of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016) (explaining that "district judges should, as a general matter, liberally permit pro se litigants to amend their pleadings" unless "amendment would be futile").

Should Plaintiff choose to file an amended complaint to re-plead the dismissed claims, he must do so within thirty days of this Opinion, addressing the deficiencies identified herein. The amended complaint will replace, not supplement, the complaint currently before the Court. It therefore must contain *all* of the claims and factual allegations Plaintiff wishes the Court to consider, including the identification of individuals and the nature of their involvement. If Plaintiff fails to abide by the thirty-day deadline, the claims that are dismissed could be

dismissed with prejudice.  In addition, to the extent that Plaintiff amends the complaint to include defendants, who previously have not been served, Plaintiff must make a separate application to the Court after filing the amended complaint to request an Order of Service for those defendants.

In addition, with regard to Plaintiff's service request, the Court directs NYSOAG to provide the Court, within thirty days of this Order, with a service address for Defendant Ramdeen.  The USMS shall effectuate service on Ramdeen within thirty days of receiving Ramdeen's address.

The Clerk of Court is respectfully requested to terminate the pending Motions, (Dkt. Nos. 39, 59), and to mail a copy of this Opinion & Order to Plaintiff.

SO ORDERED.


Dated:   March 5, 2024
         White Plains, New York

_____
        KENNETH M. KARAS
        United States District Judge